327 S.E.2d 449

**STATE of West Virginia**

**v.**

**Larry Dale FRANKLIN.**

**No. 16142.**

Supreme Court of Appeals of West Virginia.

March 1, 1985.

---

Gilbert L. Hall, Charles Town, for appellant.

James E. Garvin, Asst. Atty. Gen., Charleston, for appellee.

NEELY, Chief Justice:

Larry Dale Franklin was indicted by the grand jury of Berkeley County on 18 May 1982 under *W.Va.Code* 17C–5–2(a) [1981] for the felony charge of driving under the influence of alcohol, resulting in death. The appellant was found guilty, and, accordingly, sentenced to 1–3 years, fined, and required to pay court costs. Because, under the circumstances of this case, the activities of courtroom spectators constituted reversible error, we reverse the circuit court's holding and remand this case for a new trial.

On 5 March 1982, an aging 1969 Ford pickup truck collided with a Chevrolet Chevette. The Chevrolet's driver, Roger Moss, died of massive head injuries moments after the accident. The pickup truck, driven by the appellant, was actually owned by the wife of his companion that day, Richard Barnhart.

The appellant and Mr. Barnhart had spent a productive morning cutting and hauling wood. Mr. Barnhart testified that both the appellant and he had consumed over a six-pack of beer. Since Mr. Barnhart felt rather tipsy, he had asked Mr. Franklin to drive the pickup truck home along State Route 9, a narrow road traversing the undulating hills around Martinsburg. The record indicates that the road was dry, the sun was shining, and the air was crisp.

Nobody witnessed this accident, but the evidence suggests that the appellant, driving eastbound, collided with the westbound vehicle driven by Mr. Moss on or near the center lane, forcing the smaller vehicle off the road. The damage to Mr. Moss' vehicle was to the left, front fender, indicating that the appellant was considerably to the left of his side of the road. In any case, the appellant's truck stopped only when it struck a second westbound vehicle driven by a Mr. Largent who had been following some distance behind Mr. Moss' automobile.

This tragic accident was investigated initially by Trooper Ronald Jones who arrived, however, only after both Mr. Moss and Mr. Franklin were transported by ambulance to Martinsburg City Hospital. Mr. Moss was dead before he arrived at the hospital, while the appellant was treated for minor lacerations. Trooper Jones radioed Trooper Glen F. Macher, Jr. and informed him of the accident.

Trooper Macher went to the hospital immediately and found Mr. Franklin. The trooper testified that he had reasonable grounds to believe that Mr. Franklin had been driving under the influence of alcohol because the appellant's skin was flushed, because he mumbled and slurred his speech, and because Mr. Franklin was "mush-mouthed." In addition, he detected a "moderate" smell of alcohol on the appellant's breath. Trooper Macher read Mr. Franklin his Miranda rights, which the appellant acknowledged by signing a form but noted that he did not wish to speak to the trooper until he was advised by a lawyer.

The trooper then proceeded to fetch a blood-testing kit from his police cruiser and to describe to the appellant the use of a blood sample in testing for intoxication.

The appellant signed a consent form to permit venipuncture and then a hospital technician proceeded to extract his blood. The sample was later tested by a chemist of the Criminal Investigation Bureau of the Department of Public Safety. The results were .17 percent alcohol by weight; the appellant was legally drunk.

## I

■ The appellant maintains, in the first of his five assignments of error, that it was reversible for the circuit court to deny his motion to suppress the results of the blood alcohol test. The threshold question to be answered by this Court is whether Trooper Macher had sufficient grounds to place Mr. Franklin under arrest. Trooper Macher knew that the appellant was the driver of a vehicle that was involved in a deadly accident. He also had reason to believe that the appellant had been drinking while driving a vehicle on the motorways of this state. As such the trooper had probable cause to suspect that the appellant was guilty of a *felony* under *W.Va.Code* 17C–5–2(a) [1981].

This Court discussed the requirements of a lawful warrantless arrest of a person for a violation of Chapter 17C of the *Code of West Virginia* in *State v. Byers*, 159 W.Va. 596, 224 S.E.2d 726 (1976). Although *State v. Byers*, was decided by this Court before the Legislature enacted *W.Va.Code* 17C–5–2 [1981], which made a drunk driver who killed another motorist in a highway accident possibly guilty of a felony, *Byers* addressed the question of a warrantless arrest.

Ordinarily a warrantless arrest may be made by an officer only when he has reasonable grounds to believe that a felony has been committed. A warrantless arrest for a misdemeanor cannot be effected unless the offense is committed in the presence of the officer.

Driving under the influence of intoxicating liquor is a felony only when the offense is committed a third or subsequent time within a five-year period. In all other instances the offense is a misdemeanor. Despite the usual or possible misdemeanor character of the offense, however, this particular offense does not have to be committed 'in the presence' of the officer in order to justify a warrantless arrest. *W.Va.Code*, 17C–5A–1, *as amended*, specifically provides that a lawful arrest may be effected and a test for alcohol may be administered incident thereto at the direction of the 'arresting law-enforcement officer having reasonable grounds to believe the person to have been driving a motor vehicle ... while under the influence of intoxicating liquor.' *State v. Byers*, 159 W.Va. at 602–03, 224 S.E.2d at 731–32. [Footnotes omitted by this Court.]

■ *Byers*, distinctly envisaged the situation presented by this case where the drunk driver cannot be arrested at the scene of the crime because he has been rushed to the hospital for emergency medical care. We thus hold that since the offense of driving under the influence of alcohol resulting in death under *W.Va. Code* 17C–5–2 [1981] may be, depending on the circumstances, either a felony or misdemeanor, a lawful, warrantless arrest may be made, upon reasonable suspicion of probable cause, at a hospital by an officer before whom the offense was *not* committed if the suspect has been taken to the hospital from the scene of the accident for emergency medical care.

The appellant also denies that he consented to the extraction of his blood for the purposes of determining his alcohol content. *W.Va.Code* 17C–5–4 [1981] (the "implied consent" law) states that:

Any person who drives a motor vehicle upon the public streets or highways of this State shall be deemed to have given his consent by the operation thereof, subject to the provisions of this article, to a chemical test of either his blood, breath or urine for the purpose of determining the alcohol content of his blood whenever he shall be lawfully arrested by a law-enforcement officer ...

This statute allows a law-enforcement officer to designate which one of the three tests is to be administered. However, if the test designated is a blood test "and the

person so arrested refuses to submit to such blood test, then the law-enforcement officer making such arrest shall designate in lieu thereof, [that] either a breath or urine test be administered ..." *Id.* This section goes on to state that no person shall have his license suspended solely because he refuses to submit to a blood test.

■ The appellant admits that he signed the consent form for blood to be withdrawn, but argues that his request for a lawyer moments before negates any suggestion that his consent was "knowing and voluntary." Nonetheless, this Court agrees with the State that Mr. Franklin, by his words and conduct, voluntarily consented to the administration of venipuncture. Furthermore, the appellant does not state which of his constitutional rights was violated by the blood extraction. He refers, generally, to a violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and implies that his Fifth Amendment right to remain silent was somehow infringed upon by the removal of blood from his veins.

■ The Fifth Amendment privilege against self-incrimination exists to prohibit the state from forcing an individual to testify against himself. Mr. Justice Holmes stated in *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910): "[T]he prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material ..." 218 U.S. at 253, 31 S.Ct. at 6. And, as this Court held in *State v. Blaney*, 168 W.Va. 462, 284 S.E.2d 920 (1981), in another appeal from a conviction of driving under the influence of alcohol:

> *Miranda* principles come into play only when there is a privilege against self-incrimination guaranteed by the Fifth Amendment to the U.S. Constitution. This privilege applies in the case where there is custodial interrogation of an accused ... but we have never found it applicable where the evidence obtained from the accused is not of a testimonial

or communicative nature. 284 S.E.2d at 922.

## II

The appellant argues that the state failed to comply with the requirements of *W.Va. Code* 17C–5–8 [1981] that a blood alcohol test "must be performed in accordance with methods and standards approved by the state department of health." Syllabus Point 4 of *State v. Dyer*, 160 W.Va. 166, 233 S.E.2d 309 (1977) concludes by stating:

> When the results of a breathalizer test, not shown by the record to have been [performed in accordance with methods and standards approved by the State Department of Health] are received in the trial evidence on which the accused is convicted, the admission of such evidence is prejudicial error and the conviction will be reversed. 160 W.Va. at 167, 233 S.E.2d at 309.

Juries often accord highfalutin scientific information great weight and thus this Court has long held that a proper foundation must be laid before any scientific evidence may be admitted in a jury trial. In *State v. Hood*, 155 W.Va. 337, 184 S.E.2d 334 (1971) this Court set out the requirements for such a necessary foundation. We stated that in order to introduce such evidence, it is necessary to show:

> (1) That the testing device or equipment was in proper working order; (2) that the person giving and interpreting the test was properly qualified; (3) that the test was properly conducted; and (4) that there was compliance with any statutory requirements. 155 W.Va. at 342, 184 S.E.2d at 337.

■ Although the Court in *State v. Hood*, was discussing the breathalizer test, those four requirements are useful in determining whether the necessary foundation was established for the admission of actual blood tests as well. In Mr. Franklin's case, the chemist for the Department of Public Safety, Robert C. Murphy, testified that his testing device was in proper working order, that he was properly qualified, that the test was properly conducted, and that his method of examination was

recognized by the Department of Health as one of the suitable and acceptable methods. This Court notes that a careful study of the record conclusively reveals that Mr. Murphy showed himself to be a knowledgeable and highly competent chemist despite his inability to quote *verbatim* from the State Department of Health regulations.

### III

Shortly after the automobile accident that killed Mr. Moss, a national organization to curtail drunk driving established its first chapter in West Virginia in our eastern panhandle. This organization campaigns under the acronym MADD, which stands for Mothers Against Drunk Drivers. Sheriff Kisner of Berkeley County became MADD's first president.

During *voir dire* on the first day of Mr. Franklin's trial a lady who had been summoned for jury duty appeared at the bar of the court wearing a large, bright yellow lapel button on her blouse. Imprinted on this button were the capital letters "MADD". This lady, Eileen Cramner, explained that as she entered the courthouse a gentlemen in uniform, subsequently identified as Sheriff Kisner, handed her the MADD button and told her where to sit. Although she was immediately excused from jury duty and the sheriff was censured by the court for his partisan activity, the sheriff and other adherents of MADD remained highly visible in the courtroom throughout the three-day trial. Counsel for the defense repeatedly requested a mistrial or alternatively asked the court to order the removal of MADD buttons, or the spectators wearing them, from the courtroom; however, no further action was taken. Indeed, from ten to thirty MADD demonstrators remained in court throughout the trial and sat directly in front of the jury. Some cradled sleeping infants in their laps and all prominently displayed their MADD buttons.

The appellant alleges that it was reversible error for the court to deny his motion for a mistrial because of the presence and activities of the representatives of Mothers Against Drunk Drivers. He asserts that his right to a fair trial by an impartial jury was denied him. This Court, under the circumstances of this case, agrees. The trial court conducted an extensive *voir dire* on the subject of MADD and ascertained that fourteen of the twenty members of the jury panel knew about the organization's activities and goals. Two potential jurors were, accordingly, dismissed. (One was a member of MADD herself and the other admitted to being very uncomfortable sitting on the jury with members of the organization opposite her.) However, other than excusing these two individuals from sitting on the jury, the court refused to take any other action against the MADD presence.

*W.Va. Const.* art. III, § 14 is a clear constitutional mandate that requires an open public trial in every criminal case. *State ex rel. Herold Mail Co. v. Hamilton*, 165 W.Va. 103, 267 S.E.2d 544 (1980). This provision guarantees, both to the accused and to the public, that criminal trials are conducted unabashedly, openly and fairly. But we are concerned that the right of public access to a criminal trial be coordinated with the constitutional right of a defendant to a fair trial. *See* syl. pt. 1, *State ex rel. Herold Mail Co. v. Hamilton.* An important element in this process is insuring that the jury is always insulated, at least to the best of the court's ability, from every source of pressure or prejudice.

In *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982) the defendant was tried for the sexual assault of a high school student. During the victim's testimony a group of the victim's peers seated themselves in the courtroom as spectators. The defendant argued that the presence of the students psychologically influenced the jurors against him. This Court stated, in syllabus point 7, that: "Where a defendant moves to exclude members of the public from observing his jury trial, the ultimate question is whether, if the trial is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial." *State v. Richey*, 171 W.Va. at 345, 298 S.E.2d at 882. In that

case the Court could not find any irreparable damage to the defendant's right to a fair trial. The Court noted:

> The defendant's argument could be made as to the attendance of the general public since their presence could arguably demonstrate community hostility. Of more direct analogy would be the presence of females at a rape trial or the presence of the victim's family and relatives at any criminal trial. We must assume that a jury has the fortitude to withstand this type of public scrutiny, and cannot presume irreparable harm to the defendant's right to a fair jury trial by the presence of spectators who may have some type of a social identity with the victim of the crime. *State v. Richey*, 298 S.E.2d at 889.

■ However, the *Richey* holding is inapplicable to the facts here. In this case the spectators were clearly distinguishable from other visitors in the courtroom and, led· by the sheriff, they constituted a formidable, albeit passive, influence on the jury. Indeed, the court's cardinal failure in this case was to take no action whatever against a predominant group of ordinary citizens who were tooth and nail opposed to any finding that the defendant was not guilty. This Court quite simply cannot state that the mere presence of the spectators wearing MADD buttons and the pressure and activities of the uniformed sheriff leading them did not do irreparable damage to the defendant's right to a fair trial by an impartial jury. Indeed, it constitutes reversible error.

## IV

■ Finally, the appellant maintains that it was reversible error for the circuit court to deny his motion for a correction of sentence under *W. Va.R. Crim.Pro.* 35(a) because the circuit court sentenced him to an incarceration of one to three years without the possibility of probation.[1]

■ Apparently, and quite understandably, the circuit court was somewhat confused by the contradictory language of two statutory provisions. *W. Va. Code* 17C–5–2 [1981] appears at first blush to preclude probation for felony drunk driving while *W. Va. Code* 62–12–2 [1981] entitles anybody, upon the conviction of a felony, to be eligible for probation if that person has not been convicted of a felony within the past five years. However, since Mr. Franklin's trial this curiosity has been corrected by this Court in *State ex rel. Simpkins v. Harvey*, 172 W.Va. 312, 305 S.E.2d 268 (1983) decided a few months after Mr. Franklin's trial. In *State ex rel. Simkins v. Harvey*, we held:

> ... that suspension of sentence and release on probation is an authorized sentencing alternative for a violation of *W. Va. Code* § 17C–5–2, provided that the statutory conditions attendant to probationary release are met, *see* W.Va.Code § 62–12–19 and that probation is imposed

---

**1.** The appellant alleged two additional assignments of error that this Court will address in this footnote: First, the trial court instructed the jury that it had a choice of one of three possible verdicts: the jury could find the defendant guilty of a felony under *W.Va.Code* 17C–5–2(a) [1981]; guilty of a misdemeanor under *W.Va. Code* 17C–5–2(b) [1981]; or, not guilty. The trial court refused additional instructions that would have included possible verdicts for negligent homicide, reckless driving, or simply driving under the influence without death or bodily injury. The appellant argues that it was reversible error for the trial court to refuse instructions on these lesser included defenses. We disagree. These instructions were quite correct. The issue for the jury to determine, based upon the evidence, was whether Larry Dale Franklin was driving on the public highways of this State under the influence of alcohol and, while so doing, had an accident that resulted in the death of another driver. *W.Va.Code* 17C–5–2 [1981], under which the appellant was charged, allows the jury to convict for a felony or a misdemeanor, based upon the circumstances, or acquit the defendant because he is innocent.

The appellant also insists that it was reversible error for the circuit court to deny his motion for a judgment of acquittal and a motion for a new trial on the grounds that the verdict was not supported by substantial evidence and was contrary to the weight of that evidence. Since we do not believe that the jury was able to remain free from outside influence in this case and hence able to make a decision solely based upon the weight of the evidence, we do not need further to address this allegation of error. *See* Syl. Pt. 1, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978).

concomitantly with community service, work release, or weekend or part-time confinement. Any other interpretation of the language used by the Legislature would render meaningless the sentencing alternatives expressly authorized by *W.Va. Code* § 17C–5–2 and frustrate the rehabilitative purpose of our penal system. [Footnotes omitted by this Court.] 172 W.Va. at 320, 305 S.E.2d at 276.

Therefore, since we have remanded this case this dilemma is resolved for Mr. Franklin.

Accordingly, for the reasons expressed above, the holding of the Circuit Court of Berkeley County is reversed and this case is remanded to that court for retrial.

Reversed and Remanded.